UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JODI SHAW,<br>                    *Plaintiff*,<br><br>v.<br><br>SMITH COLLEGE, KIA BROWN,<br>HANNAH DURRANT,<br><br>                    *Defendants*. | Civil Action No. 3:21-cv-12064-KAR |

## **DEFENDANTS' ANSWER TO COMPLAINT**

Pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure, Defendants Smith College (hereinafter "Smith" or the "College"), Kia Brown (hereinafter "Ms. Brown"), and Hannah Durrant (hereinafter "Ms. Durrant") (collectively "Defendants") hereby answer the Complaint of Plaintiff Jodi Shaw (hereinafter "Plaintiff").  Any allegation not specifically admitted is expressly denied.  To the extent that numbered headings or sub-headings contain any factual allegations, such allegations are expressly denied.  Defendants answer each paragraph as follows:

1.      The allegations in Paragraph 1 state conclusions of law to which no response is required.  Defendants deny that Plaintiff's baseless complaint in any way implicates any violation of any federal and state civil rights laws.

2.      Denied.

3.      Denied.

4.      Denied.

5.      Denied.

6.      Defendants deny that Plaintiff has asserted any viable claim under Title VII of the

1

Civil Rights Act of 1964 of 42 U.S.C. §1981 and, for that reason, deny that this Court has jurisdiction over her unfounded claims.

7.      For the reasons stated in response to Paragraph 6, Defendants deny that Plaintiff has asserted any viable federal claim or that she has properly invoked the jurisdiction of this Court, and, for that reason, deny that this Court has supplemental jurisdiction over any claims asserted under the laws of the Commonwealth of Massachusetts.

8.      Denied, for the reasons stated in response to Paragraphs 6 and 7.

9.      Defendants admit that Plaintiff was employed at the College from September 2017 until her voluntary resignation in February 2021.  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9 and, therefore, deny them.

10.     Defendants admit that Plaintiff is an alumna of the College and that she received a Bachelor of Arts degree after majoring in Anthropology (not cultural anthropology, which is an introductory course).

11.     Defendants admit that the College is a private college and Massachusetts charitable corporation with a principal place of administration in Northampton, Commonwealth of Massachusetts.  Defendants further admit that the College admits women at the undergraduate level and admits both men and women as graduate students.  Defendants deny any remaining allegations in Paragraph 11.

12.     Defendants admit only that Plaintiff filed an internal complaint at the College. Defendants deny all remaining allegations in Paragraph 12.

13.     Admitted.

14.     Defendants admit only that Ms. Durrant was the Associate Director and Director

of Residence Life during Plaintiff's tenure at the College.  Otherwise, denied.

15.     Denied.

16.     Admitted.

17.     Defendants deny Plaintiff's characterization of a report by a black, female student of the College (the "Student") regarding an incident that occurred on campus on July 31, 2018, during which a College employee (the "Caller") called the College's Campus Safety office to report that a person who "appeared to be a male party" was "laying down or resting" on the sofa in a building and that the person "looked out of place because the building was empty" (the "Incident").  Defendants admit the allegations regarding the position and identifying race of the Caller.  Further answering, Defendants state that Plaintiff had no involvement in the Incident in any way whatsoever.

18.     Defendants deny Plaintiff's characterization of the findings reflected in a 35-page report concerning the comprehensive, independent investigation of the Incident conducted by two, external investigators (the "Independent Investigative Report"), which concluded that the evidence did not support a finding of race discrimination against any employee involved in the Incident.  Further answering, Defendants state that Plaintiff was not involved in the Incident or related investigation in any way whatsoever.

19.     Denied.

20.     Defendants admit only that a College campus safety officer (the "Responding Officer") arrived at the scene of the Incident in response to the Caller's report, that the Student video-recorded a portion of her interaction with the Caller and the Responding Officer, and that the Student later posted the video of this interaction on her personal Facebook page.  Defendants deny that the Independent Investigative Report concluded that the Caller followed "explicit

procedures" of the College; to the contrary, the Independent Investigative Report stated that the investigators "did not identify any staff policies that would inform the [Caller] how to respond to 'suspicious persons' or 'suspicious activity.'"  Defendants deny all remaining allegations in Paragraph 20.

21.     Defendants admit that the Incident received media attention.  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21 and, therefore, deny them.

22.     Defendants admit that three weeks after the Incident, the Student made a post on Facebook (the "Facebook Post") that included the names, staff photographs, and campus directory contact information of two College employees (the "Two Employees"), neither of whom was the Caller.  Defendants deny that the Facebook Post included an accusation that the Two Employees "plac[e]d a racially motivated call to campus security," and state that the Student removed the Facebook Post at the College's request.  Defendants admit the allegations regarding the position and identifying race of the Two Employees.  Further answering, Defendants state that Plaintiff had no involvement with the Facebook Post or the College's related follow-up in any way whatsoever.

23.     Defendants admit that neither of the Two Employees initially identified in the deleted Facebook Post were the Caller.  Defendants deny the remaining allegations in Paragraph 23.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Defendants admit only that on October 28, 2018, the College publicly (not

4

"quietly," as Plaintiff wrongly contends) released a 35-page report reflecting the results of a comprehensive, independent investigation of the Incident conducted by two, external (not "internal," as Plaintiff wrongly contends) investigators (the "Independent Investigative Report"). Defendants deny all remaining allegations in Paragraph 27.

28.     Defendants deny Plaintiff's characterization of the Independent Investigative Report, which speaks for itself in its entirety.

29.     Denied.

30.     Denied.

31.     Denied.

32.     Defendants admit that one of the Two Employees ("Employee A") later resigned from the College. Defendants admit the allegation regarding Employee A's role at the College and deny the remaining allegations in Paragraph 32. Further answering, Defendants state that Plaintiff was not involved in any way whatsoever in the events concerning Employee A.

33.     Defendants admit that the other of the Two Employees ("Employee B") continued her employment (and, in fact, remains employed by the College) and the allegation regarding Employee B's role at the College. Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 33 and, therefore, deny them. Further answering, Defendants state that Plaintiff was not involved in any way whatsoever in the alleged events concerning Employee B.

34.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 34 and, therefore, deny them.

35.     Defendants admit only that that Employee B was not involved in the Incident, and that on or about May 10, 2020, the Student confronted Employee B about the Incident in a

campus dining hall (the "Confrontation"), after which the College's Office of Student Affairs pursued a conduct complaint against the Student, who accepted responsibility and was disciplined for the Confrontation. Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35 and, therefore, deny them. Further answering, Defendants state that Plaintiff was not involved in any way whatsoever in the events concerning the Confrontation or the College's response.

36.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 36 and, therefore, deny them. Further answering, Defendants state the College requested that Employee B provide the referenced note to the College to facilitate the collection of forensic evidence, but Employee B declined. Further answering, Defendants state that Plaintiff was not involved in any way whatsoever in these events.

37.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 37 and, therefore, deny them.

38.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 38 and, therefore, deny them.

39.     Denied. Further answering, Defendants state that Plaintiff was not involved in any way whatsoever in the Student's report about the Incident, the College's handling of that report, or any events involving the Caller, Employee A, or Employee B.

40.     Denied.

41.     Defendants admit that the College's President (the "President") sent an email to the campus community in August 2018 stating that she had "reached out to [the Student], offered a meeting and apologized on behalf of the college."

42.     Denied.

43.     Defendants admit that in September 2017, Plaintiff began her employment in Smith's library as a temporary employee, and that thereafter Plaintiff was employed by the College through her voluntary resignation in February 2021.  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 43 and, therefore, deny them.

44.     Defendants admit that Plaintiff graduated from the College.  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44 and, therefore, deny them.

45.     Defendants admit that in September 2017, the College hired Plaintiff through a temp agency to work in Smith's library.

46.     Defendants admit that because the College's library had open positions that had not been filled, the term of Plaintiff's temporary employment was extended.  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 46 and, therefore, deny them.

47.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 47 and, therefore, deny them.

48.     Defendants admit that when Plaintiff's temporary employment concluded, the College hired Plaintiff in a limited term position as a non-exempt employee.

49.     Defendants admit that Plaintiff participated in planning a library orientation for incoming Smith students and was asked to prepare something engaging.  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 49 and, therefore, deny them.

50.     Defendants admit that in the summer of 2018, Plaintiff applied for a newly created position at the College, the First Year Experience and Engagement ("FYEE") Librarian. Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 50 and, therefore, deny them.

51.     Defendants admit that Plaintiff's former supervisor (the "Former Supervisor") asked Complainant to prepare a draft of a description for the proposed FYEE position to be reviewed by the leadership team for the College's libraries and Human Resources, that the College's hiring committee viewed Plaintiff as a strong candidate for the new FYEE Librarian position after her initial interview, and that the committee advanced Plaintiff to the second and final round of interviews.  Defendants deny that the Former Supervisor "indicated" to Plaintiff that the FYEE position "was as good as hers."  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 51 and, therefore, deny them.

52.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 53 regarding Plaintiff's purported background in "music composition and performance" and, therefore, deny them.  Further answering, Defendants state that while Plaintiff now characterizes her proposed presentation as a "rap," her contemporaneous emails reflect her view that she did not then believe that her presentation "even qualified as a 'rap.'"  Specifically: (a) Plaintiff sent an email to her new, interim supervisor (the "Interim Supervisor") on August 28, 2018, stating, "I think a mistake I made was using the word 'rap' to describe what the presentation is.  It is a rhyming presentation set to music… *I do not believe it even qualifies as a 'rap'* so I apologize for using that word"; and (b) Plaintiff sent another email to the Interim Supervisor on August 29, 2018, stating that she had "consulted with a few people

who have experience in performing arts" and that they "confirmed that [the proposed piece] is *not a 'rap' but a 'patter song*.'" Defendants deny all remaining allegations in Paragraph 52.

53.     Denied.

54.     Defendants admit that after the Former Supervisor retired in June 2018, Plaintiff reported to the Interim Supervisor. Defendants deny any remaining allegations in Paragraph 54.

55.     Defendants admit that the Interim Supervisor told Plaintiff that performing her self-described "patter song" was not advisable. Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 55 and therefore, deny them.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 61 and, therefore, deny them.

62.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 62 and, therefore, deny them. Further answering, Defendant state that Plaintiff was not excluded from consideration for the FYEE position.

63.     Defendants admit that Plaintiff voluntarily withdrew her application for the FYEE position and weeks later accepted a position as a Student Support Coordinator in Residence Life, a development to which the Interim Supervisor responded, "Though I'm sorry to lose you as a library colleague, I'm looking forward to further collaboration around New Student Orientation

through the Office of Student Affairs."  Otherwise, denied.

64.     Defendants admit that Plaintiff met with a representative of Human Resources
(the "HR Representative") to discuss her disappointment about not performing her proposed
"patter song," her dislike of the Interim Supervisor, and her desire to pursue a position in
Residence Life for which she had applied and interviewed.  Defendants deny Plaintiff's
contention that the HR Representative did not "seriously" listen to Plaintiff, which Plaintiff
knows is categorically false.  In fact, after Plaintiff several meetings with the HR Representative,
Plaintiff sent the HR Representative a handwritten card stating:

> *What has been a comfort to me are the people who were (and are) around me who so
> generously dole out 'reality checks' (much needed) from time to time.  This, you have
> done for me during our listening sessions at Smith HR.  I cannot give enough thanks so
> this card will have to suffice.  You are extremely kind and generous to give me such
> engaged attention ...  Thank you [HR Representative], you are a real asset to Smith and
> to the human race in general*

Defendants admit that Plaintiff met with Smith's Ombudsperson (the "Ombuds") but deny that
the Ombuds did not "seriously" listen to Plaintiff.  Because the content of communications with
the Ombuds' office are held in strict confidence, Defendants are without information or
knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 64 regarding
those communications and, therefore, deny them.   Defendants deny any remaining allegations in
Paragraph 64.

65.     Regarding Plaintiff's communications with the HR Representative, Defendants
deny the allegations in Paragraph 65.  Regarding Plaintiff's communications with the Ombuds,
Defendants are without information or knowledge sufficient to form a belief as to the truth of the
allegations in Paragraph 65 regarding those communications and, therefore, deny them.  Further
answering, Defendants state that Plaintiff applied and interviewed for the position as a Student
Support Coordinator *before* the events concerning her proposed "patter song" presentation.

66.     Denied.

67.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 67 and, therefore, deny them.

68.     Defendants admit only that Plaintiff withdrew her application for the position of FYEE Librarian at the College and the College then hired her as a Student Support Coordinator in the College's Residence Life Department, a non-exempt position.  Otherwise, denied.

69.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 69 and, therefore, deny them.

70.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 70 and, therefore, deny them.

71.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 71 and, therefore, deny them.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Defendants admit that the referenced employee of the College ("Employee C") serves as a point person for low income, first generation, transgender, and non-binary students at the College.  Defendants deny that the College "disseminated" the referenced training and all remaining allegations in Paragraph 76.

77.     Denied.

78.     Defendants admit that the referenced video (the "Video"), which was created by the Chicago Theological Seminary, was discussed in the summer of 2020 during a remote

learning module for the College's *student* leaders titled "Leading in a Diverse Community." Defendants deny Plaintiff's characterization of the 71-second Video, divorced from the context of a nearly hour-long learning module in which presenters emphasized that the material concerned "a huge, complicated topic for lifelong learning."

79.    Defendants deny Plaintiff's characterization of the Video, which does not depict the police officer "violently lung[ing]" at the man, and state that the Video speaks for itself in the context of the entire learning module.

80.    Defendants state that the portion of the Video depicting the man looking at a street sign occurs before, not after, the portion involving a police officer, but otherwise admitted.

81.    Admitted.

82.    Denied.

83.    Denied.  Further answering, Defendants state that the Video was not part of any training offered to Plaintiff.

84.    Defendants admit only that certain, regulated recreational use of marijuana was legalized in Massachusetts in November 2018.  Defendants deny that the change in Massachusetts law had an impact on marijuana use on campus or otherwise increased requests for housing accommodations.

85.    Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 85 and, therefore, deny them.  Further answering, Defendants state that the College's Residence Life staff was consistently trained to address routine reports about substance use in campus housing (e.g., underage alcohol use, marijuana use) and that they are not addressed as matters for campus safety.

86.    Defendants are without information or knowledge sufficient to form a belief as to

the truth of the allegations in Paragraph 86 and, therefore, deny them.

87.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 87 and, therefore, deny them.

88.     Denied.

89.     Denied.

90.     Admitted.

91.     Denied.  Further answering, Defendants state that the identifying races of both students were known at the beginning of their conflict and were not "discovered" later.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Defendants admit that in or about April 2019 (and at many other times), students distributed and posted letters expressing pain and anger about various issues throughout the College's campus.  Defendants deny any insinuation that Plaintiff's "office door" was targeted for these types of messages and deny any remaining allegations in Paragraph 95.

96.     Denied.

97.     Admitted.

98.     Denied.

99.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 99 and, therefore, deny them.

100.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 100 and, therefore, deny them.

101.     Defendants are without information or knowledge sufficient to form a belief as to

the truth of the allegations in Paragraph 101 and, therefore, deny them.

102.    Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 102 and, therefore, deny them.

103.    Defendants deny that the letter referenced in Paragraph 95 contained any "threat" that anyone would "be attacked."  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 103 and, therefore, deny them.

104.    Denied.

105.    Denied.  Further answering, Defendants state that the College's affinity housing is open to students of all races, and that applications to reside in affinity housing do not request and are not evaluated based on a student's racial or ethnic identity.

106.    Admitted.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Defendants admit that all community members at the College, including Plaintiff, were encouraged to participate in Cromwell Day events, and that the College's Vice President for Equity and Inclusion ("Employee D"), moderated events in November 2019.  Otherwise, denied.

111.    Defendants admit that the College's website describes Cromwell Day as follows: "Cromwell Day provides dedicated time and space for reflection and education about diversity, racism and inclusion.  Through the work of the Office for Equity & Inclusion (OEI), together with campus partners, the college seeks to take individual and community responsibility for our

behavior with an awareness of how that behavior furthers and disrupts patterns of structural oppression."

112.    Defendants admit that one of several, optional workshops presented on Cromwell Day in November 2019 was titled, "Why is it So Difficult for White People to See and Understand Racism and White Supremacy."  Otherwise, denied.

113.    Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 113 and, therefore, deny them.

114.    Defendants admit only that the speaker addressed topics of race in a scholarly and nuanced manner, and that his slide deck included topics such: *Spectrum and web of racism*; *Possible explanations for why it is so difficult for white people to see and understand racism and white supremacy*; *Working with stereotypes that underpin implicit racism*; and *How white people can be allies in the struggle against racism and white supremacy*.  Defendants deny that the speaker's slide deck was "offensive," or could have been perceived as such by any reasonable person, and they deny any remaining allegations in Paragraph 114.

115.    Denied.

116.    Denied.

117.    Denied.

118.    Denied.

119.    Admitted.  Further answering, Defendants state that attendance at these lunches was voluntary.

120.    Defendants admit that Employee D sent emails to all staff members inviting them to participate in voluntary lunches and further inviting interested participants to share, if they wished, information about the groups with which they identify.  Otherwise, denied.

121.     Admitted.

122.     Denied.

123.     Defendants admit that in or about November 2019, Plaintiff met with the College's Assistant Director for Residence Leadership ("Employee E"), after Plaintiff professed purported interest in learning more about the department's social justice curriculum.  Otherwise, denied.

124.     Denied.  Further answering, Employee E (who identifies as white) stated to Plaintiff (who also identifies as white), "It is a privilege *for us* to not have to talk about race, so *we should* be talking about race."

125.     Defendants admit that Plaintiff requested, and Employee E provided to Plaintiff, a pamphlet called "Social Justice: Terms, Concepts, and Resources," but they deny that Employee E ever said that the pamphlet "was the model for Smith's Resident Life Curriculum," because it was not.  Defendants deny any remaining allegations in Paragraph 125.

126.     Defendants admit only that members of the College's Residence Life Staff worked on a curriculum that discussed many possible forms of oppression, including sexism, classicism, racism, gender oppression, xenophobia, heterosexism, ableism, adultism, ageism, religious oppression, and the like.  Defendants deny all remaining allegations in Paragraph 126.

127.     Denied.  Further answering, Defendants state that they are unaware of the origins of the attached document or any instance in which it was used in a training for students or anyone else at the College.

128.     Denied.

129.     Denied.

130.     Denied.  Further answering, Defendants state that the College's affinity housing is

open to students of all races, and that applications to reside in affinity housing do not request and are not evaluated based on a student's racial or ethnic identity.

131.     Denied.  Further answering, Defendants state that the College's affinity housing is open to students of all races, and that applications to reside in affinity housing do not request and are not evaluated based on by a student's racial or ethnic identity.

132.     Defendants admit that at the beginning of the 2019/2020 academic year, the College, following the recommendation of its Residence Experience Working Group and in line with similar housing initiatives throughout higher education, implemented an offering of affinity houses.  Defendants deny that any residence option at the College is segregated by race, and further answering state that affinity housing options, like all housing options, are open to students of all races.  Defendants deny all remaining allegations in Paragraph 132.

133.     Denied.

134.     Defendants deny Plaintiff's erroneous claim that affinity housing is "just for black students," which is categorically false.  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 134 about a purported remark by an unidentified member of the College's housekeeping staff and, therefore, deny them.

135.     Defendants deny Plaintiff's baseless claim that affinity housing is "reserved for black students," which is categorically false.  Defendants admit that Plaintiff proposed to Ms. Brown to assign several incoming first year students to affinity housing, and that Ms. Brown did not accept that proposal because the College's housing policy provided that *all* special-interest housing options, including affinity houses, food cooperatives, substance-free houses, and apartment-style housing, were reserved for sophomores, juniors, and seniors.  Defendants deny

all remaining allegations in Paragraph 135.

136.    Denied.  Further answering, Defendants state that during the fall of 2019, a total of 8 students were assigned to temporary bed spaces, and that of those 8 students, 4 identified as black, 2 identified as white, 1 identified as multi-racial, and 1 identified as Asian.

137.    Denied.

138.    Denied.

139.    Defendants admit that Plaintiff asserted to her supervisors that she was uncomfortable "making assumptions" about people based on "skin color," which was something that she was never asked, required, or expected to do.  Defendants deny all remaining allegations in Paragraph 139.

140.    Denied.

141.    Defendants admit that the Residence Life Staff, including Plaintiff, attended a 3-day retreat (the "Retreat") that addressed a wide variety of topics, including relationship development, curriculum development, departmental mission, vision and goals, and day-to day operational tasks.  Defendants deny that the Retreat "focused … on racial issues" and deny all remaining allegations in Paragraph 141.

142.    Defendants deny that the College "hosted" or sent to Plaintiff's email account any form of "rhetoric" regarding race.  Defendants are without information or knowledge sufficient to form a belief as to the truth of allegations in Paragraph 142 that purport to describe Plaintiff's beliefs and, therefore, deny them.

143.    Defendants admit that prior to the Retreat, Plaintiff told Ms. Durrant that Plaintiff was uncomfortable talking about her thoughts and feelings about race/color.  Defendants deny all remaining allegations in Paragraph 143.

144.   Admitted.

145.   Defendants admit that members of the College's Residence Life staff, including Plaintiff, attended a session at the Retreat conducted by two presenters from Romney Associates, Inc. (the "Presenters"), and that the stated goals of the session were as follows: "ResLife staff will get to know one another and build teamwork"; "ResLife Staff will increase their understanding of their own and others' racial and cultural identity"; and "ResLife staff will build skills to supervise in culturally affirming ways."  Defendants further admit that members of the Residence Life staff were invited to engage in a discussion about culture and race, which included questions such as:

- Can you describe the community you grew up in? (in terms of race and culture)

- As a child, what did you understand about your cultural and/or racial identity?

- What was most difficult or important in college about your racial/cultural identify?

Defendants deny that this session was presented or described as "race therapy" (or that any reasonable person would have perceived it as such), and they deny any remaining allegations in Paragraph 145.

146.   Defendants admit that Plaintiff stated that she did not feel comfortable talking about race and color.  Defendants deny that Plaintiff did not "respond" during this session at the Retreat, as she frequently interrupted the Presenters in a disruptive manner and was persistently and aggressively combative with them and her colleagues, which prompted multiple complaints by her colleagues.

147.   Denied.

148.   Denied.

149.   Denied.

150.   Denied.  Further answering, Defendants state that many of Plaintiff's colleagues reported that they were frustrated and unsettled by Plaintiff's belligerence, combativeness, dismissiveness, and unwillingness to listen.

151.   Denied.

152.   Admitted.

153.   Defendants admit that Plaintiff (who identifies as white) and Ms. Brown (who identifies as black) *both* stated to the Presenters that they felt more productive working when working independently.  Defendants deny any remaining allegations in Paragraph 153.

154.   Defendants admit that the document attached as Exhibit E, which speaks for itself in its entirety (without handwritten notations), was made available to participants in the Retreat. Otherwise, denied.

155.   Defendants admit that at one session during the Retreat, participants were invited to engage in a discussion about culture and race, and that they were invited—not required—to respond to questions of the type referenced in the response to Paragraph 145 above.  Defendants deny the remaining allegations in Paragraph 155.

156.   Denied.

157.   Denied.

158.   Defendants admit only that Ms. Durrant told Plaintiff that several of Plaintiff's colleagues were offended by how she had treated the Presenters, and that Ms. Durrant was disappointed by Plaintiff's disruptive, aggressive, and rude behavior towards them and her colleagues.  Defendants deny that Ms. Durrant expressed disappointment in Plaintiff's unwillingness to talk about her race, given that they had previously discussed that Plaintiff could

respond to inquiries about her race by stating, "I'm uncomfortable discussing that," which Plaintiff did.  *See* Response to Paragraph 144 above.

159.    Denied.

160.    Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 160 and, therefore, deny them.

161.    Denied.

162.    Because Ms. Durrant never made any such comment to Plaintiff, Defendants deny the allegation in Paragraph 162 regarding the "implication" of a non-existent comment.

163.    Defendants admit that Plaintiff told Ms. Brown that she was distressed after the Retreat and about discussing race.  Otherwise, denied.

164.    Defendants deny that the College created a "racially hostile environment" or that Plaintiff could have suffered any resulting distress.  Defendants are without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 164 about stressors in Plaintiff's life.

165.    Defendants admit that Plaintiff told Ms. Brown that Plaintiff remained uncomfortable discussing race at work and would not do so.  Otherwise, denied.

166.    Defendants deny that Ms. Brown and Plaintiff had any discussion about "categorizing people based on skin color," which is false, and they deny all remaining allegations in Paragraph 166.  Further answering, Defendants state that Ms. Brown told Plaintiff that circumstances could arise in her job when a discussion of race might be needed, using as an example the need to address and respond to a complaint by a student who reported being bullied in housing due to their race and who wished to discuss their race as a point of concern.

167.    Denied.

168.    Denied.

169.    Defendants admit that after Plaintiff expressed that she wished to pursue a complaint about her experience at the Retreat and her unwillingness to discuss race, Ms. Brown suggested that Plaintiff discuss that issue with Ms. Durrant, in her role as the Director of Residence Life, because Ms. Brown had not been involved in the planning or execution of the Retreat and because Ms. Brown felt that she lacked sufficient experience to handle a complaint about Plaintiff's professional development.  Further answering, Defendants state that Ms. Brown told Plaintiff that she would fully support her if Plaintiff chose to pursue a complaint, which Ms. Brown did.  Defendants deny all remaining allegations in Paragraph 169.

170.    Denied.  Further answering, the term "feels" is not a "disparaging, memetic internet term used to ridicule a person's feelings," as Plaintiff asserts, but rather a term to describe one's own feelings of heightened emotion (e.g., "that love song gives me the feels").

171.    Defendants admit that Plaintiff filed an internal complaint in the College's Office of Equal Opportunity and Compliance.  Otherwise, denied.

172.    Defendants admit that on February 7, 2020, Plaintiff met with the College's then Director of Equal Opportunity and Compliance/Title IX Coordinator ("Employee F") to discuss options regarding Plaintiff's concerns about alleged discrimination and hostility, which included discussing initiating and executing a "pre-complaint resolution."  Otherwise, denied.

173.    Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 173 and, therefore, deny them

174.    Denied.  Further answering, Defendants state the College accepted and investigated Plaintiff's complaint when she eventually filed it.

175.    Defendants admit that Employee F informed Plaintiff that the College would

retain an independent, experienced outside investigator to investigate her complaint.  Otherwise, denied.

176.    Defendants admit that Plaintiff expressed concerns about retaliation to Employee F in various communications.  Otherwise, denied.

177.    Denied.

178.    Admitted.

179.    Defendants admit that on March 2, 2020, Plaintiff sent an email to Employee F, which speaks for itself.  Otherwise, denied.

180.    Defendants admit that Plaintiff had a meeting with Ms. Brown, but deny that the meeting, which took place in June 2020, occurred "a few days" after March 2, 2020.

181.    Denied.

182.    Denied.

183.    Denied.

184.    Denied.

185.    Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 185 and, therefore, deny them.

186.    Denied.

187.    Denied.

188.    Defendants admit only that on June 30, 2020, Employee F sent Plaintiff an email, which  speaks for itself.  Otherwise, denied.

189.    Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 189 and, therefore, deny them.

190.    Defendants admit that Plaintiff submitted the second part of her internal

complaint on Mary 20, 2020, which speaks for itself in its entirety (73, single-spaced pages). Defendants deny that Plaintiff was subjected to a racially hostile or discriminatory environment at the College, a conclusion that was confirmed by the report of an independent, external investigator.

191.     Defendants admit that on May 25, 2020, a Minneapolis police officer murdered George Floyd, an act that received worldwide condemnation and resulted in the conviction on all criminal charges against him.  Otherwise, denied.

192.     Defendants admit that on June 1, 2020, seven days after the murder of George Floyd, members of the College's community were invited to attend *Generating Justice*, a virtual gathering of students, faculty, and staff in response to ongoing racist brutality.  Otherwise, denied.

193.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 193 and, therefore, deny them.

194.     Defendants admit that after the College's two *Generating Justice* gatherings, the College sent an email to its staff and faculty inviting them to read or watch resources that had been curated for and crowdsourced from those virtual gatherings, or to join a community discussion sponsored by the College's Office for Equity and Inclusion and the Center for Religious and Spiritual Life.  Defendants admit that the email identified dozens of written and video resources that had been compiled by community members in an effort to foster a commitment to the work of dismantling racism, and that one of the resources was a blog post titled, "Dear White People, This is What We Want You to Do."

195.     Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 195 and, therefore, deny them.

196.     Defendants admit that on June 4, 2020, ten days after the murder of George

Floyd, the President posted a letter to the College's students, staff, faculty, and alums.

Defendants deny Plaintiff's characterization of this letter, which states in full as follows:

*Dear students, staff, faculty and alums:*

*It has been less than a week since Vice President for Equity and Inclusion [Employee D] and I wrote to the campus community; yet, in that short time, so much has happened across our nation.  Black people and their allies have organized demonstrations in cities large and small, while political leaders and extremist groups have taken advantage of protests to sow division and undermine free speech.  It is a good time to remind ourselves that needed reforms have originated as protest against established practices that we knew to be wrong. Protest is a right.*

*The deliberate and brazen suffocation of George Floyd by a police officer, while three other officers stood by and did not intervene, is emblematic of the suffering Black people have endured in this country for more than 400 years.  It is little wonder that our nation is convulsed with anger and anguish as it confronts the horrific legacy of slavery as well as the pernicious effects of institutional and societal racism that endure to this day.*

*I am sickened by the murders of George Floyd, Ahmaud Arbery, Breonna Taylor, Tony McDade and countless others. It is time to acknowledge that the work of anti-racism is white people's work.  As we bear witness to the entrenched pain of Black people who are telling us that they are "not okay," we must learn how to be more effective allies by truly reflecting on our privilege—and risking that privilege in moments that matter.  Beyond vigils, beyond marches, we must commit ourselves to learning and to action.*

*Since George Floyd's murder, I have heard from a number of Black students and alums about the many ways Smith has not protected them, not done enough to prevent harm and pain, not created the conditions for full equality and true belonging.  Know that I understand that learning cannot happen in an environment where people feel frightened and oppressed.  The heart and soul of Smith College rests on all of our students feeling safe, valued and included. Smith College must change to ensure this.*

*As members of a community founded on educational access and committed to the pursuit of knowledge, we must open our eyes to the violence around us, understand and confront its root causes and raise our voices for change.  We must name white supremacy and anti-Blackness—society's unwillingness to recognize the humanity of Black people—for what it is and dismantle the structural barriers that keep racism alive.*

*At Smith, here are several examples of work underway to dismantle structural inequality.*

*First, students have advocated important changes that we have implemented, such as affinity housing, resources for the Mwangi Center and programming for students of color.*

*Second, we have been working with TurboVote.org and the All-In Campus Democracy Challenge to register voters and get out the vote; we need leaders at the local, state and national levels who are committed to sponsoring anti-racism legislation and to preventing acts of voter suppression.*

*Third, we have revised our hiring processes so that members of search committees have been trained to recognize implicit bias, with the goal of recruiting a diverse faculty and staff that is reflective of the nation.*

*Fourth, we are building our own police force from the ground up to reflect Smith community values; importantly, our team in the Office for Equity and Inclusion will provide newly conceived training for that department to prevent racial profiling in all its forms. I am proud of our 10-person team in the Office for Equity and Inclusion; together they are leading important programming throughout the college and gathering resources from which we can learn.*

*Importantly, each one of us can support organizations and candidates who are fighting against white supremacy, racism and anti-Blackness in all its forms.*

*I realize that much work awaits us. Yesterday, I saw a protestor with a sign reading "Silence costs lives." I will not be silent, even though I know I will make mistakes. And I will also be listening to and learning from others as we move forward as a community.*

197.    Defendants admit that the President's June 4, 2020, letter includes the quoted phrase in the context set forth above in response to Paragraph 196. Defendants otherwise deny Plaintiff's gross mischaracterization of the President's letter, which does *not* "specifically malign[] white people as singularly responsible for racism" but rather calls for their support as allies.

198.    Defendants admit on June 16, 2020, the President and Employee D posted a message to the College's staff and faculty titled "Observing Juneteenth, June 16, 2020." Defendants deny Plaintiff's characterization of this letter, which states (in full) as follows:

*Dear Staff and Faculty,*

*This Friday, June 19, Smith College will observe Juneteenth, which marks the anniversary of the day in 1865 that Union troops arrived in Texas and announced that all slaves were now free in accordance with the 1863 Emancipation Proclamation. We are suspending work as usual for all faculty and staff on Friday.*

*To mark this day, we are encouraging our Black colleagues to rest and rejuvenate. If you*

*would like to gather in a virtual community, you could choose to meet with the Black Staff and Faculty Affinity Group at 11 a.m. Please email oei@smith.edu for a Zoom link.*

*We are encouraging our white and non-Black colleagues of color to spend time educating themselves and taking other actions to actively counter racism in all its forms. There are many ways to do this work.  You could read or watch a resource from this list, which was curated for and crowdsourced from Smith's two Generating Justice virtual gatherings.  If you prefer to join a community discussion, the Office for Equity and Inclusion and the Center for Religious and Spiritual Life will sponsor four different opportunities on Friday; sign up via this form.*

*Juneteenth is a bittersweet day. It recognizes both freedom proclaimed and justice delayed.  At Smith, we know that the road to true equity and inclusion is long, but we are committed to traveling it together.*

*In solidarity,*

199.    Admitted.  Further answering, Defendants state that Ms. Durrant's forwarding email stated, " [Employee H] shared this with her direct reports (and me;).  An opportunity for us to do some personal learning and reflection."

200.    Defendants admit that Employee H's email, sent 15 days after the murder of George Floyd, stated, "This is an organic initiative that some of Smith's junior faculty have brought to our attention.  On June 10, 2020, I ask you to consider how you will stop business as usual and engage in some personal reflection and anti-racist work and learning."

201.    Defendants admit that Employee H's email contained a link to a page at http://www.shutdownstem.com titled, #ShutDownAcademia, #Shutdownstem.  The page stated in full (with original bolded emphasis):

**On June 10, 2020, we will #ShutDownAcademia, #ShutDownSTEM, and #Strike4BlackLives.**

*In the wake of the most recent murders of Black people in the US, it is clear that white and other non-Black people have to step up and do the work to eradicate anti-Black racism.  As members of the global academic and STEM [Science, Technology, Engineering, and Mathematics] communities, we have an enormous ethical obligation to stop doing "business as usual."  No matter where we physically live, we impact and are impacted by this moment in history.*

*Our responsibility starts with our role in society.  In academia, our thoughts and words turn into new ways of knowing.  Our research papers turn into media releases, books and legislation that reinforce anti-Black narratives.  In STEM, we create technologies that affect every part of our society and are routinely weaponized against Black people.*

*Black academic and Black STEM professionals are hurting because they exist in and are attacked by institutional and systemic racism.  Black people have been tirelessly working for change, alongside their Indigenous and People of Color allies.  For Black academics and STEM professionals, #ShutDownAcademia and #ShutDownSTEM is a time to prioritize their needs— whether that is to rest, reflect, or to act— without incurring additional cumulative disadvantage.*

*Those of us who are not Black, particularly those of us who are white, play a key role in perpetuating systemic racism.  Direct actions are needed to stop this injustice.  Unless you engage directly with eliminating racism, you are perpetuating it.  This moment calls for profound and meaningful change. #ShutDownAcademia and #ShutDownSTEM is the time for white and non-Black People of Color (NBPOC) to not only educate themselves, but to define a detailed plan of action to carry forward.  Wednesday June 10, 2020 will mark the day that we transition into a lifelong commitment of actions to eradicate anti-Black racism in academia and STEM.  We join with members of Particles for Justice in calling for a #Strike4BlackLives.*

*To be clear: #ShutDownSTEM is aimed at the broad research community who is not directly participating in ending the global pandemic, COVID-19.  If your daily activities are directly helping us end this global crisis, we send our sincerest gratitude.  The rest of us, **we need to get to work**.*

***Share your detailed plans and actions with the global community using the hashtags #ShutDownSTEM and #ShutDownAcademia.***

*Our collective efforts will lead to eradicating anti-Black racism because **Black lives depend on it**.*

202.    Defendants admit that Ms. Durrant sent an email titled "support our Black colleagues" to white identified colleagues that stated, in its entirety:

*[Employee E] and I were chatting today to think about ways to honor #shutdownacademia as a department.  One idea we came up with is for white identified folks there is opportunity for us to think about how to support colleagues of color— specifically our Black identified colleagues.*

*I will be hosting a virtual meeting on wednesday 6/10 at 4pm if you would like to join me to discuss the above topics.  There is no expectation you attend and is in no way required. If you are interested, let me know and I will send you a google invite.*

*Let me know if you have any questions.*

28

*Take Care,*

*Hannah*

203.    Defendants admit that Plaintiff did not respond to an email that did nothing more than invite her to join others in "think[ing] about how to support colleagues of color" in the immediate wake of George Floyd's murder, if she was "interested."   Defendants deny Plaintiff's allegation that the College ever "implied" that her unwillingness to attend, or reservations about attending this meeting—one expressly intended to explore ways to "support colleagues of color"— would "be framed as an act of aggression," or a "white 'power-play,'" or any "violation of her undefined 'cultural competency.'"  Defendants deny that Ms. Durrant's email would have caused any reasonable person to suffer "distress," but they are without information or knowledge sufficient to form a belief as to Plaintiff's reaction.  Defendants are without information or knowledge sufficient to form a belief as to the truth of any remaining allegations in Paragraph 203 and, therefore, deny them.

204.    Denied.

205.    Defendants admit that Plaintiff's first, formal performance review occurred on or about September 30, 2020.  Otherwise, denied.

206.    Defendants admit that Ms. Durrant attended Plaintiff's formal performance review, as she did with all members of the Residence Life staff during the Spring and Summer of 2020, and that Plaintiff had named Ms. Durrant in her internal complaint.  Otherwise, denied.

207.    Defendants admit that Plaintiff requested to record her formal performance review, and that her request was rejected.  Defendants deny that Plaintiff objected to Ms. Durrant's presence during the review and deny that Ms. Durrant's presence departed from an "standard practice" at the College.

208.    Defendants admit that a discussion of "Cultural Competency" was not addressed

during Plaintiff's formal performance review due to the pendency of her internal complaint.

209.    Denied.

210.    Defendants deny that the January 2020 retreat was a "race training session," and they deny that Ms. Brown ever stated to Plaintiff that her "resistance" during a non-existent "race training session" was "an example of Plaintiff's deficient 'cultural competency.'"  Further answering, Defendants state that during Ms. Brown's pre-job performance review conversation with Plaintiff in June 2020, Ms. Brown conveyed to Plaintiff that her disruptive behavior at the Retreat had hindered a learning opportunity for others on the Residence Life team and reflected Plaintiff's failure to understand the impact of her behavior and actions on others.

211.    Defendants admit that Plaintiff has a degree from the College and that she majored in Anthropology (not "cultural anthropology," which is an introductory course offering). Defendants deny any insinuation that Plaintiff's college major would support an inference that she is more qualified to understand the impact of her behavior and actions on others.

212.    Admitted.

213.    Defendants admit only that on July 31, 2020, Plaintiff sent an email to the College's Vice President of Human Resources (Employee G"), which speaks for itself. Otherwise, denied.

214.    Denied.

215.    Denied.

216.    Defendants admit that Plaintiff met with Employee D, the College's Vice President of Equity and Inclusion.  Defendants deny the remaining allegations in Paragraph 216.

217.    Defendants admit that Plaintiff expressed confusion to Employee D about the concepts of equity and inclusion and her upcoming performance review.  Otherwise, denied.

218.    Defendants admit that given Plaintiff's professed confusion about the concepts of equity and inclusion, Employee D expressed to her that Employee C had materials that might be useful to developing her understanding, and that Plaintiff expressed an interest in those materials. Further answering, Employee D then sent an email to Employee C seeking to provide Plaintiff access to information and resources that Employee C maintained in a Moodle environment for a voluntary group of faculty and staff interested in the subject of white accountability (the "Group"), stating to Employee C, "[Plaintiff] would like to participate in your group." Otherwise, denied.

219.    Defendants admit that after Employee C received Employee D's email (and believing Plaintiff wanted to participate in the Group), Employee C sent an email to Plaintiff with the referenced opening salutation.  Otherwise, denied.

220.    Defendants admit that Plaintiff promptly sent an email to Employee C stating, "To be clear, I am not signing up on your group," and that Employee C then promptly removed Plaintiff from the Group's Moodle page.  Defendants further admit that Plaintiff sent emails to Employee C seeking "official college definitions" for the "equity" and "inclusion," which Employee C did not have.  Otherwise, denied.

221.    Defendants admit that Employee C sent an email to Plaintiff stating, "Here are some resources that might be useful," and that that Employee C provided Plaintiff community-sourced resources used by the Group, including (1) a glossary of terms from the best-selling book *Me and White Supremacy,* by Layla F. Saad, and (2) a *Racial Equity Tools Glossary* found at https://www.racialequitytools.org/glossary.  Otherwise, denied.

222.    Defendants deny that Ms. Durrant forwarded the referenced email to Residence Life staff, which in fact was shared by someone else, and they deny all remaining allegations in

Paragraph 222, including the false claim that participation in the panel discussion was "racially segregated."

223.    Denied.

224.    Denied.

225.    Defendants admit that Plaintiff sent an email to Ms. Brown on August 20, 2020, in which she made that remark and then asked Ms. Brown to review a "welcome letter" that Plaintiff had drafted for residents of a dormitory.  Defendants deny Plaintiff's allegation that Ms. Brown "ignored the email," which is categorically false.  In fact, Ms. Brown responded directly to Plaintiff within minutes and simultaneously forwarded her email to Employee H and Ms. Durrant to obtain additional information, and this email chain concluded that very afternoon with message from Ms. Durrant stating, "Thank you [Plaintiff] for doing this!"

226.    Denied.

227.    Denied.

228.    Defendants admit that the College announced an intention to furlough staff during the COVID-19 pandemic in April 2020, more than four months *before* the events described above.  Otherwise, denied.

229.    Denied.  Further answering, Defendants state that the President's April 20, 2020, message titled "COVID-19 scenario planning: academic program and finances," stated as follow with respect to furloughs:

> Unfortunately, these circumstances will require us to consider staffing changes, given that salaries and benefits comprise the largest portion of the college's expenses (58%). We plan to use a phased approach. All 12-month benefit-eligible employees will be guaranteed salary continuity through May 31; however *some staff will be placed on summer furlough, full or partial, if there is not sufficient work for them while the college remains in remote operation.*  In those cases where furloughs are necessary, staff will be temporarily laid off but retain their benefits.  We are also modeling voluntary retirement options for staff and faculty and will be in touch when we have more to share.  (emphasis

added).

230.    Denied.

231.    Admitted.

232.    Defendants deny that Ms. Durrant and Ms. Brown "took away" any "responsibility" regarding "housekeeping notifications" "without  cause or justification," as there had been a change in responsibilities due to the COVID-19 pandemic and Plaintiff's furlough status, during which Plaintiff took vacation time and some of her tasks (including housekeeping notifications) were covered by others.  Defendants deny all remaining allegations in Paragraph 232.

233.    Admitted.

234.    Defendants admit only that on October 30, 2020, Plaintiff sent an email to Employee F, which speaks for itself, and in which Plaintiff  observed that the Investigator "appeared to be conducting her work in a highly efficient manner."  Otherwise, denied.

235.    Denied.

236.    Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 236 and, therefore, deny them.

237.    Denied.

238.    Defendants admit that on October 27, 2020, Plaintiff posted a YouTube video (the "YouTube Video") in which she falsely claimed, among other things, that the College's policies and initiatives "promote a divisive, racially hostile work environment," and that the YouTube video was viewed by thousands.  Defendants deny all remaining allegations in Paragraph 238.

239.    Defendants admit that on November 2, 2020, Employee F sent an email to Plaintiff offering to share the outcome of the investigation. The email speaks for itself. Otherwise, denied.

33

240.    Defendants admit that on November 2, 2020, Employee F and Employee D met with Plaintiff and informed her that after a fair and proper investigation under the College's policies, an external, independent investigator had finished her investigation, submitted her 224-page report, and concluded that there was insufficient evidence to establish that any of the named respondents had discriminated against Plaintiff on the basis of her race, harassed Plaintiff on the basis of her race, or retaliated against her, and Employee F further informed Plaintiff that there was insufficient evidence that the incidents about which Plaintiff had complained were severe or pervasive enough to create an objectively hostile work environment based on race.

241.    Defendants admit that the College's Residence Life Department issued a newsletter on November 3, 2021, which included a picture titled "A Guide to White Privilege." The newsletter speaks for itself.  Otherwise, denied.

242.    Defendants deny Plaintiff's characterization of the quotation from a 2015 conference regarding "deflection" that was included in the newsletter, which speaks for itself.

243.    Defendants deny Plaintiff's characterization of a comment describing an article by Peggy McIntosh titled *White Privilege: Unpacking the Visible Knapsack* that is referenced in the newsletter, which actually states:

> *Peggy McIntosh's article explains how white privilege functions on individual and systemic levels.  Whiteness can be hard for white people to acknowledge and the self-victimization of white people is extremely harmful for Black people and people of color.*
>
> *"I was taught to see racism only in individual acts of meanness, not in invisible systems conferring dominance on my group."*

244.    Denied.

245.    Defendants admit that the independent, external investigator interviewed 15 people, including the 3 persons named as respondents, and that the investigator concluded that there was insufficient evidence to establish that any of the respondents had discriminated against

Plaintiff, harassed her, or retaliated against her.   Otherwise, denied.

246.   Denied.

247.   Denied.

248.   Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 248 and, therefore, deny them.

249.   Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 249 and, therefore, deny them.

250.   Denied.

251.   Defendants admit that Plaintiff was invited to meet, and did meet, with representatives from the College's Human Resources Office to discuss the threatening communications that Plaintiff and others at the College had received as result of Plaintiff's posting of the YouTube Video.

252.   Denied.  Further answering, Defendants state that after Plaintiff was unable to attend a meeting offered to her department on November 6, 2020, an alternate meeting was scheduled for November 12, but Plaintiff left work early that day.  Thereafter, Plaintiff requested, and was granted, a meeting with the College's Dean of Students ("Employee H") and the College's Assistant Director of Human Resources ("Employee I").

253.   Denied.

254.   Defendants deny that Employee H and Employee I "interrogated" Plaintiff. Defendants admit that Employee H, Employee I, and Plaintiff discussed Plaintiff's YouTube Video and Twitter postings in which Plaintiff disparaged the College.  Defendants admit that Employee H and Employee I asked Plaintiff if she could fulfill her responsibility to support students who lived in affinity housing, given that Plaintiff had raised objections to affinity

housing.  Further answering, Defendants state that Employee H and Employee I advised Plaintiff

that due to Plaintiff's posting of her YouTube Video, multiple members of the College's

community, both inside and outside of Residence Life, had received disturbing and threatening

email communications, and that the College's Campus Safety office was investigating, which

included closer monitoring of email accounts.  Defendants admit that Employee H and Employee

I informed Plaintiff that during Campus Safety's investigation, the College discovered that

Plaintiff had forward multiple emails from her Residence Life email account *to her personal*

*email account*, an act that raised concern about potential violations of the College's policies and

law.  Plaintiff admitted that she had been forwarding emails since February 2020, and that she

had deleted an email from the sent folder of the Residence Life account, which, in the College's

assessment, reflected an attempt to conceal her actions.  When Employee H and Employee I

asked Plaintiff why she had forwarded the College's emails to her personal email account,

Plaintiff repeatedly stated, "I have to check with legal counsel."  Defendants deny all remaining

allegations in Paragraph 254.

255.    Defendants admit that Employee I advised Plaintiff that given the College's

concern about a violation of the College's legal obligation to maintain the confidentiality of

student information, which also represented a violation of the College's own policies, the

College was placing Plaintiff on paid administrative leave, effective immediately, while the

College investigated and assessed the impact of Plaintiff's unauthorized actions.

256.    Denied, as Employee I fully explained to Plaintiff what she had done wrong and

why was being placed on leave.  Further answering, Defendants state that when Plaintiff asked

Employee I for copies of the emails that she had referenced, Employee I responded that Plaintiff

"should know" what emails they were discussing, since Plaintiff had forwarded them to her

personal email.

257.     Denied.  Further answering, Defendant state that the investigation concerned Plaintiff's undisputed, improper forwarding of emails containing legally protected, confidential student information to her personal email.

258.     Denied.  Further answering, Defendants state that Ms. Durrant offered to meet with students who were concerned about the Office of Residence Life as a result of Plaintiff's posting of her YouTube Video.

259.     Denied.  Further answering, Defendants state that based on its investigation, the College determined that Plaintiff had violated the College's Policy on Acceptable Use of Computer Resources, which prohibits unauthorized "access or disclose of confidential information or invasion of personal privacy," and the Smith Code of Conduct, which prohibits employees from "releas[ing] confidential information without clearance from her or his department head," and that the College issued a "formal warning" as a "corrective action."

260.     Denied.

261.     Defendants admit that Plaintiff voluntarily resigned on February 19, 2021, after Plaintiff had parlayed her public complaints about the College and creation of a GoFundMe page to generate several hundred thousand dollars, many multiples of her salary at the College. Otherwise, denied.

262.     Denied.

263.     Denied.

264.     Denied.

265.     Defendants admit that Plaintiff filed a unfounded complaint of discrimination against the College with the MCAD and the EEOC.  Otherwise, denied.

266.    Defendants admit that in her complaint, Plaintiff alleges that she had been subjected to discrimination based on her race and retaliation.  Otherwise, denied.

267.    The allegations in Paragraph 267 state conclusions of law to which no response is required.

268.    The allegations in Paragraph 268 state conclusions of law to which no response is required.  To the extent a response is required, the Defendants admit that Plaintiff withdrew her meritless complaint from the EEOC so that she could pursue it in court.

**COUNT 1 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. 2000E, *ET SEQ.*) AND 42 U.S.C. § 1981 (UNLAWFUL RACIAL DISCRIMINATION AND CONSTRUCTIVE DISCHARGE)**
(Against Smith College)

269.    Defendants restate and incorporate by reference their responses to Paragraphs 1 through 268 of the Complaint as if fully set forth herein.

270.    Denied.

271.    Denied.

272.    Denied.

273.    Denied.

274.    Denied.

275.    Denied.

276.    Denied.

**COUNT 2 – VIOLATION OF 42 U.S.C. § 1981 (UNLAWFUL RACIAL DISCRIMINATION)**
(Against Brown and Durrant)

277.    Defendants restate and incorporate by reference their responses to Paragraphs 1 through 276 of the Complaint as if fully set forth herein.

278.    Denied.

279.   Denied.

280.   Denied.

281.   Denied.

282.   Denied.

283.   Denied.

**COUNT 3 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. 2000E, *ET SEQ.*) AND 42 U.S.C. § 1981 (UNLAWFUL RACIAL HARASSMENT/HOSTILE ENVIRONMENT)**
(Against Smith College)

284.   Defendants restate and incorporate by reference their responses to Paragraphs 1 through 283 of the Complaint as if fully set forth herein.

285.   Denied.

286.   Denied.

287.   Denied.

288.   Denied.

289.   Denied.

290.   Denied.

291.   Denied.

**COUNT 4 – VIOLATION OF 42 U.S.C. § 1981 (UNLAWFUL RACIAL HARASSMENT)**
(Against Brown and Durrant)

292.   Defendants restate and incorporate by reference their responses to Paragraphs 1 through 291 of the Complaint as if fully set forth herein.

293.   Denied.

294.   Denied.

295.   Denied.

296.    Denied.

297.    Denied.

## COUNT 5 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. 2000E, *ET SEQ.*) AND 42 U.S.C. § 1981 (RETALIATION)
(Against Smith College)

298.    Defendants restate and incorporate by reference their responses to Paragraphs 1 through 297 of the Complaint as if fully set forth herein.

299.    Denied.

300.    Denied.

301.    Denied.

302.    Denied.

303.    Denied.

304.    Denied.

305.    Denied.

## COUNT 6 – VIOLATION OF 42 U.S.C. § 1981 (RETALIATION)
(Against Brown and Durrant)

306.    Defendants restate and incorporate by reference their responses to Paragraphs 1 through 305 of the Complaint as if fully set forth herein.

307.    Denied.

308.    Denied.

309.    Denied.

310.    Denied.

311.    Denied.

312.    Denied.

313.     Defendants restate and incorporate by reference their responses to Paragraphs 1 through 312 of the Complaint as if fully set forth herein.

314.     Denied.

315.     Denied.

316.     Denied.

317.     Denied.

**COUNT 7 – VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
**(42 U.S.C. §2000D *ET SEQ.*)**
**(INTENTIONALDISCRIMINATION)**
(Against All Defendants)

318.     Defendants restate and incorporate by reference their responses to Paragraphs 1 through 317 of the Complaint as if fully set forth herein.

319.     The allegations in Paragraph 319 state conclusions of law to which no response is required.  Defendants deny that their actions violated Title VI of the Civil Rights Act of 1964 ("Title VI"), or any other federal or state law.

320.     Defendants admit that Smith College receives federal financial assistance. Defendants deny that Title VI or its prohibitions are implicated by the Defendants' actions.

321.     Denied.

322.     Denied.

323.     Denied.

324.     Denied.

325.     Denied.

326.     Denied.

327.     Denied.

328.     The allegations in Paragraph 328 state conclusions of law to which no response is

required.  Defendants deny that their actions violated Title VI or that Plaintiff is entitled to any form of relief.

### COUNT 8 – VIOLATION OF M.G.L. CHAPTER 151B, SECTION 4
### (RACE DISCRIMINATION AND CONSTRUCTIVE DISCHARGE)
(Against All Defendants)

329.    Defendants restate and incorporate by reference their responses to Paragraphs 1 through 328 of the Complaint as if fully set forth herein.

330.    Denied.

331.    Denied.

332.    Denied.

333.    Denied.

334.    The allegations in Paragraph 334 state conclusions of law to which no response is required.  Defendants deny that Plaintiff has "properly" or "timely" filed a complaint of discrimination with the MCAD because her complaint is entirely without merit.

335.    Admitted.

336.    The allegations in Paragraph 336 state conclusions of law to which no response is required.   Defendants admit that Plaintiff withdrew her complaint from the MCAD so that she could pursue it in court.

337.    The allegations in Paragraph 337 state conclusions of law to which no response is required.  Defendants deny that Plaintiff has any basis to assert a private civil action against Smith.

### COUNT 9 – VIOLATION OF M.G.L. CHAPTER 151B, SECTION 4
### (RETALIATION)
(Against All Defendants)

338.    Defendants restate and incorporate by reference their responses to Paragraphs 1 through 337 of the Complaint as if fully set forth herein.

42

339.    Denied.

340.    Denied.

341.    Denied.

342.    The allegations in Paragraph 342 state conclusions of law to which no response is required.  Defendants deny that Plaintiff has "properly" or "timely" filed a complaint of discrimination with the MCAD because her complaint is entirely without merit.

343.    Admitted.

344.    The allegations in Paragraph 344 state conclusions of law to which no response is required.  Defendants admit that Plaintiff withdrew her complaint from the MCAD so that she could pursue it in court.

345.    The allegations in Paragraph 345 state conclusions of law to which no response is required.  Defendants deny that Plaintiff has any basis to assert a private civil action against Smith.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's damages, if any, must be reduced to the extent she failed to mitigate them.

### THIRD AFFIRMATIVE DEFENSE

At all times relevant to this case, Defendants acted reasonably, in good faith, and in accordance with their legal duties, rights, and obligations.

### FOURTH AFFIRMATIVE DEFENSE

The claims arising out of the subject matter of the transactions and occurrences alleged are barred by the applicable statute of limitations.

## FIFTH AFFIRMATIVE DEFENSE

Defendant Smith College is a charitable corporation and any recovery by plaintiff is limited by the provisions of G.L. c.231, §85K.

## SIXTH AFFIRMATIVE DEFENSE

Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent during discovery proceedings in this action and hereby reserve the right to amend their Answer and to assert any such defense by appropriate motion.

**WHEREFORE**, the Defendants ask that this Court:

A.      Dismiss Plaintiff's claims with prejudice; and

B.      Award such other relief as the Court deems just and proper.

Respectfully submitted,
**SMITH COLLEGE, KIA BROWN, AND HANNAH DURRANT,**
By their attorneys,

/s/ Scott A Roberts
Scott A. Roberts, BBO #550732
sroberts@hrwlawyers.com
Arielle B. Kristan (BBO# 677048)
akristan@hrwlawyers.com
Hirsch Roberts Weinstein LLP
24 Federal Street, 12th Floor
Boston, MA  02110
Phone: (617) 348-4300
Fax: (617) 348-4343

Dated: March 4, 2022

## <u>CERTIFICATE OF SERVICE</u>

      I, Scott A. Roberts, certify that this document, filed through the Electronic Case Filing (ECF) system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 4, 2022.

                              /s/ Scott A. Roberts
                              Scott A. Roberts